*J. R. Morton, for appellants.*

*J. B. Huston, for appellee.*

---

## HENRY KRAMER *v.* COMMONWEALTH.

**Criminal Law—Homicide—Threats—Evidence of Bruises on Defendant —Evidence—Self-Defense Defined.**

In a charge of murder where threats have been made by the deceased against the life of the defendant and some of them communicated to defendant, all are admissible as evidence.

**Evidence of Bruises on Defendant.**

In a charge of murder, where self-defense is relied upon, evidence of bruises on the defendant shortly after the offense is committed, is admissible.

**Evidence.**

When in a murder trial it appears that a short time before the killing the deceased had been placed under bond on application of defendant, to keep the peace and be of good behavior to defendant, the record of such proceeding is admissible to show the tendency of defendant to resort to the law rather than to violence and because it served to illustrate the character of deceased.

**Self-Defense.**

Under the defense of self-defense in a murder charge, the rule is that when one believes and has reasonable ground to believe that he is in danger of immediately losing his life, or of sustaining great bodily injury at the hands of another, he has a right to do whatever is apparently necessary for his own security. He must act rationally, in view of all the facts and circumstances, but if these are such that there is no other apparent safe means of escaping the danger, he may legally slay his adversary.

APPEAL FROM CAMPBELL CIRCUIT COURT.

March 13, 1875.

OPINION BY JUDGE COFER:

Henry Kramer, having been found guilty of manslaughter and adjudged to be confined in the penitentiary for twenty-one years for the killing of his brother, Auguste Kramer, by shooting him with a shot gun, seeks a reversal of that judgment.

The evidence tended to prove an old grudge between Henry and Auguste, which probably originated from the seduction of the wife of the former by the latter. About a month before the final tragedy, Auguste went to where Henry was sitting in company with some ladies, and asked to borrow his accordeon; and being told by his brother that it was broken, he said it was not; and upon Henry's repeating the statement, Auguste, in a rage, said to him that if he would come out into the lane, which was near by, he would kill him, that he would not fight him in the yard, but if he would come into the lane he would fight and kill him. On this occasion the conduct of Henry was passive, and gave no indication of a purpose to injure his brother, or to even engage in a quarrel with him.

On the day of the homicide, and only a short time before it occurred, the brothers were in a difficulty, and Auguste was about being taken to prison when Henry offered to take him home, and induced the officer not to arrest him, giving as a reason that he was then under bond to keep the peace. When they reached home and were at the supper table, a quarrel sprang up between them, but what was said is not proved. Their mother, who seems to have been the only other person present, says they quarreled in English, and being a German she could not understand the language used. They got up and went into the yard, where, as the mother swears, Augeste struck Henry with a broom stick. ·Very soon after this Auguste ran to the house of a neighbor only a few yards distant and asked for a knife, saying, "Henry will not fight fair. He wants to kill me, and I want a butcher knife. I will have to knife him." But failing to get a knife, he said Henry was hurting his mother, and started and ran toward the house where Henry and his mother were, and took up a stone as he went, and when near to the house, he and Henry began to throw stones at each other. Whether there was a cessation in the throwing of stones before the shooting does not appear, but after they had exchanged throws, Henry seized a shot gun and shot twice, inflicting one or more wounds.

After evidence had been offered tending to prove these facts, the appellant proved that Auguste, in January before the homicide was committed, had threatened to kill him, but that the threat not appearing to have been communicated to him, the evidence that it had been made was excluded, and an exception having been taken, that action of the court is now called in question.

In *Cornelius v. Commonwealth,* 15 B. Mon. 539, the prisoner proved that the deceased had made threats against him, and had tried to hire persons to kill him, and that these facts had been communicated to him before the killing occurred. He then offered to prove other threats, which had not been communicated; and this court held that the evidence should have been admitted, because it tended to confirm and strengthen the other evidence of threats. We are not aware that the soundness of this rule has ever been called in question, and we adhere to it, not only for the reason then given, but for the additional reason that it tends to show the persistent disposition of the deceased, and to aid the jury in forming a more correct estimate of his character, and of the danger that might have been apprehended at his hands.

The same witness who testified to the threats which were excluded, also testified that the appellant, when placed in jail on the charge of murder, had bruises on his head and arms; but this evidence was also excluded. When taken in connection with the evidence of Mrs. Kramer, the testimony as to bruises on the person of the appellant was not only competent, but important, and should have been allowed to remain before the jury.

It appears that in January before he was killed, Auguste had been arrested on a warrant sued out by Henry, and placed under bond to keep the peace and be of good behavior towards Henry and his wife; and the record of that proceeding was tendered in evidence, but was not allowed to go before the jury. The record should have been admitted, both because it tended to show a disposition on the part of the prisoner to resort to the law rather than to violence, and because it served to illustrate the character of the deceased.

Whether the recital in the judgment in that case that the deceased had threatened to do violence to the prisoner, is competent evidence that such threats had actually been made, is not so clear; and if there was no other evidence of threats, we should hesitate to admit that part of the record, but under the circumstances of this case, we think the whole should have gone to the jury to have such weight as they thought it entitled to.

The instructions asked for by the appellant were properly re-fused, but the court did not correctly define the law of self-defense. The instruction on that subject is objectionable in two respects. The jury were told that self-defense is the right one has, when without fault himself, he is attacked by another, under such circumstances as to furnish reasonable grounds for apprehending a design to take his life, or do him some great bodily harm.

It is not every fault that will deprive a person of the right of self-defense. Insulting or provoking language or gestures may be faults, but clearly do not deprive the person using the language of making the gestures of his right to defend himself against danger to his life or limb. Nor will an assault, or even a battery, always have this effect. If A assaults B, and then withdraws in good faith from the encounter, all danger of a renewal of the assault being en-tirely passed, and B then attacks A, the latter may lawfully defend himself, notwithstanding his antecedent fault in making the first assault.

The use of the words "when he is attacked," in the instruction, was calculated to mislead the jury. The right to strike in the de-fense of one's life does not necessarily depend upon his having been first actually attacked. To be attacked is to be set upon with hostility and violence, to be assaulted or assailed; and the language used in the instruction may have been understood by the jury to mean, as it literally imports, that the right of self-defense depends upon the actual doing of some act of violence to the person of the prisoner; certainly it could not have been understood to mean less than that no such right could exist until the prisoner was assaulted. We are not prepared to approve a definition so restricted. There may be such apparent danger of immediate death or serious bodily injury as will warrant one in striking or shooting in self-defense, when there has been no actual attack.

The true rule is that when one believes, and has reasonable ground to believe that he is in danger of immediately losing his life, or of sustaining great bodily injury at the hands of another, he has a right to do whatever is apparently necessary for his own security; he must act rationally, in view of all the facts and circumstances sur-rounding him, but if these are such that there is no other apparent and safe means of escaping the impending danger, he may slay his adversary, and will be excusable.

The ninth instruction asked for by the appellant assumes, as true facts, that which the jury should have been permitted to decide,

and is also objectionable because it is based upon a part only of the evidence.

For the errors indicated the judgment is *reversed,* and the cause is remanded for further proceedings.

*W. A. Abbott, for appellant.*
*John Rodman, for appellee.*